[Civ. No. 12960. First Dist., Div. One. May 29, 1946.]

R. H. MADDERN, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

John J. O'Toole, City Attorney, and Sylvain D. Leipsic, Deputy City Attorney, for Appellant.

William A. White and Edward E. Heavey for Respondent.

SCHOTTKY, J. pro tem.—Plaintiff brought this action under the Public Liability Act of 1923 (Stats. 1923, p. 675; 2 Deering's Gen. Laws, Act 5619) to recover damages for personal injuries to himself and damages to his automobile, sustained when, while driving on Bush Street between Franklin Street and Van Ness Avenue in San Francisco, the pavement

collapsed and his car sunk into the depression. The action was tried before a jury, and a verdict rendered in plaintiff's favor for $3,585. From the judgment entered pursuant thereto the defendant city has appealed.

The accident happened about 10:30 in the evening of January 7, 1944. Plaintiff was driving alone in his car, and when he was about three-quarters of the way down the block from Franklin Street toward Van Ness Avenue his car began to lurch toward the left and then toward the right; and when it came to a stop the back end was resting in a large depression, the front end was a little above street level, and the car was at about a 45-degree angle. Plaintiff climbed out of the car, remained five or ten minutes, left to make a telephone call and returned to the scene, declined the services of an ambulance, and remained about an hour before going home. He had been thrown to the floor of the car by the impact and suffered from bruises and nervous shock. The size of the depression into which the car had sunk was variously estimated at from 65 to 80 feet long, 10 to 12 feet wide, and 8 to 10 feet deep. It is not disputed that the pavement collapsed into this depression while plaintiff was driving over it. The slope in grade of Bush Street from Franklin Street toward Van Ness Avenue is 5½ per cent. The sewer, located in the middle of the street, is approximately 8 feet below the surface of the street and drops at a descent parallel to the street. There was one cement or concrete sewer pipe 15 inches in diameter. Between the pipe and the pavement, and supporting the latter was a sandy soil which is common to this area. There was an asphalt concrete wearing surface for the pavement of two inches thickness; its concrete base was around six inches.

As grounds for reversal of the judgment defendant contends: 1. That the evidence does not establish any element of knowledge upon the part of the city or notice to the city; 2. The trial court erred in admitting into evidence that there was a replacement by the city of pipe in the whole block six months subsequent to the accident; 3. The court erred in its instructions to the jury; and 4. The damages are grossly excessive. We shall discuss these contentions in the order of their statement.

The portion of the Public Liability Act pertinent here reads as follows: ''Counties, municipalities and school districts shall be liable for injuries to persons and property resulting from the dangerous or defective condition of public streets, high-

ways, . . . and property in all cases where the governing or managing board of such county, municipality, school district, or other board, officer, or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such street, highway . . . and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition.''

It is not contended by plaintiff that there was any evidence of actual notice to the defendant city or actual knowledge on its part, but plaintiff relies upon constructive notice.

Before discussing the contention of defendant that the evidence is insufficient to establish constructive notice on the part of the city, we shall briefly summarize the evidence.

Reuben Nybakken, witness for the plaintiff, testified that he worked for the James F. Waters Co., automobile agency located on the southwest corner of Bush and Van Ness, and had been so employed for some time prior to January 7, 1944, the date of the collapse of the street and consequent injury to plaintiff. He recalled the incident herein involved. The collapse occurred on Bush Street, some relatively short distance west of Van Ness Avenue, and in the approximate center of that street. Nybakken lived directly across the street from his place of employment—his residence being an apartment house on the northwest corner of Bush and Van Ness. He crossed Bush Street (at the place where the collapse occurred) every day to go to lunch. He and other of the employees of James F. Waters Co. usually went to the Little Fawn Restaurant, located on the northwest corner of Bush and Van Ness. In crossing Bush Street for lunch he ''noticed the street was cracked, started at the intersection and back up Bush Street towards Franklin was cracked twenty or thirty feet, I would say.'' He first noticed that crack about ''four or five days'' prior to its collapse on January 7, 1944. The crack ran lengthwise with Bush Street, and he said that it was about 1½ inches wide and that he could look down into it about 2 feet and see concrete. On more particular questioning concerning the extension of the crack from the intersection or the Van Ness property line, he said that it started at the Van Ness property line and ran about 30 feet west on Bush towards

Franklin Street. He did not report the fact of having seen the crack to anyone in the City Hall whose duty it would be to maintain the streets.

Norman E. Taber, witness for plaintiff, also worked in the James F. Waters Co., and was likewise in the habit of going to the Little Fawn Restaurant. While crossing Bush to go to the restaurant he had noticed a crack in the street "two or three days" prior to the collapse of the street. It was a small "break in a paved street," running lengthwise with Bush Street, about midway between the two sidewalks. It began west of Van Ness, and was "twenty or thirty" feet long. Over the period of time (prior to the collapse) that the witness had observed the crack it increased to a width of about "three inches." He looked down into the crack for a distance of about one foot, and he saw what appeared to have been asphalt. Taber never reported having seen the crack in the street to anyone in the City Hall who might remedy the defect.

Plaintiff examined Emile Muheim, Superintendent of the San Francisco Bureau of Street and Sewer Repair, under section 2055 of the Code of Civil Procedure. The witness held that position during all the times concerned in this action. He testified that "There are something like 325 street sweepers that are instructed to watch the streets and curbs, manhole covers, cesspool covers, etc., and get in communication with the proper authorities. There are six men, I believe, in the traffic bureau, in the City Engineer's office, it is part of their duty. There are also five inspectors." He said that he was, on the evening of January 7, 1944, called to the scene of the street collapse herein involved by his general foreman. Because of the great amount of sand washed away under the pavement at the situs of the break, he concluded that the sewer pipe had a break in it through which the subpavement sand had escaped. The easternmost tip of the hole in the street was about "ten or twelve feet west of the west property line of Van Ness Avenue." That 10 or 12 foot area was likewise somewhat undermined, and the witness directed people who were standing on that undermined asphalt to move away lest it should also collapse. The end (eastern) of the hole— that is, the asphalt pavement—was supporting the front of plaintiff's auto, and Muheim said he saw no cracks in the street easterly from the front of plaintiff's car to the property line of Van Ness Avenue. The undermined area east of

the easternmost tip of the hole in the pavement extended about 6 or 7 feet toward Van Ness. He said that if there would have been a crack in the street for several days prior to the collapse, it would have assumed the shape of an inverted "V"—resulting in a depression on the surface of the street, and that there would be no opening (as plaintiff's witnesses Taber and Nybakken had testified) which could have been looked down into by someone standing on the street.

His opinion was that there had been a bursting of the concrete sewer pipe at the bottom thereof somewhere near the place where the collapse occurred, and that the sand which reposed between the surface (supporting the pavement) and the (8 foot deep) pipe had seeped through such break in the pipe and washed away. He said that such could have taken place in about eight hours and would not have shown on the surface of the street. It does not appear in the record that Muheim indicated any particular place as being that in which this "pipe burst" had occurred, nor does he say that he saw any break in the pipe beneath the undermined area east of the easternmost tip of the hole caused by the collapse, and over which the pavement remained intact. There was a 5½ per cent downhill grade on Bush Street from Franklin to Van Ness, and the sewer pipe was installed at the approximate same grading.

There was read into the record the deposition of defense witness P. R. Kelly, Assistant Superintendent of the San Francisco Bureau of Sewer Repair. He was general foreman of that agency at the time of the incident herein involved. He was familiar with the collapse of the street at Bush and Van Ness of January 7, 1944, having been called to the scene the night of the collapse of that street. The cave-in was about 8 feet deep (exposing to view the top of the pipe), 60 feet long and 12 feet wide. His inspection showed that several lengths of pipe had collapsed, but he said "It may have been due to the pavement dropping on to it. There was no way of determining that." About 20 or 30 feet of the pipe was collapsed, and the rest (apparently in that 60 foot long area) was "disarranged." He did not say that any breaks appeared in that portion of the pipe which lay in the undermined area (testified to by Muheim) east of the easternmost tip of the hole proper into which plaintiff's car had dropped, and over which (further testified to by Muheim) the pavement remained intact. He said that there was about 8 feet between the hole

and the western property line of Van Ness Avenue. The pavement proper consisted of 2 inches of asphalt surfacing and beneath that a 6-inch base of concrete. His theory was (as was Muheim's) that the sand between the surface and the sewer pipe had been washed away through a hole in the pipe, and that the surface collapsed in virtue of the supporting sand bed being displaced and washed away. He said that the whole process of undermining could have happened in a space of two hours. He determined that the process must have been speedy because there was no ''scum'' evident on the underside of the pavement that had collapsed.

The defense presented two employees of James F. Waters Co., William Hyland and James W. Gilmore, both of whom testified that they too had been in the habit of crossing Bush Street to go to the restaurant for lunch, and both said that they had never seen, prior to January 7, 1944, the crack in the street testified to by plaintiff's witnesses Taber and Nybakken.

The conflicts arising from the above evidence are manifest. It should be noted that neither Hyland nor Gilmore (defendant's witnesses) said that they had noted that no cracks existed on Bush Street from two to five days prior to January 7, 1944, but both only said that they had not noted any such cracks. Both of plaintiff's witnesses were very conclusive concerning their perception of such cracks from two to five days prior to the evening that the pavement collapsed.

Immediately after the collapse of the street in January, 1944, new pipe was installed at the location of the cave-in to the extent of 84 feet, but plaintiff also introduced evidence showing that on July 13, 1943 (6 months prior to the cave-in), the city had replaced 10 feet of the concrete pipe at a point some 113 feet westerly of the January, 1944, break, with a different type of pipe; and, over defendant's objection, plaintiff introduced evidence to show that in June, 1944, the city replaced the entire sewer in the block with the same type of pipe they had used in replacing the 10-foot section in July, 1943.

■ Defendant argues that the evidence of plaintiff is unconvincing and attempts to demonstrate from the remainder of the record that the testimony of plaintiff's witnesses that the cracks were in the pavement several days before the accident cannot be believed. However, under the familiar and well-settled rule that where the evidence is conflicting, an appellate

tribunal may not substitute its judgment for that of the trial court, we must hold that the jury was not as a matter of law unjustified in its implied conclusion that such cracks did exist on Bush Street for a period of four or five days prior to the accident, and the question that we have to decide is whether or not, under all the facts and circumstances of this case, the evidence is sufficient to charge the defendant city with constructive notice.

Appellant argues that even disregarding the weaknesses in respondent's evidence, it fails to show constructive notice, on the part of the city because it does not show ''long continued neglect.'' It argues that to show constructive notice a ''substantial'' interval of time must elapse between the first evidence of a defect and the accident. Appellant cites many cases wherein language is used to the effect that to constitute constructive notice the defect must be ''long continued and patent,'' that there must be ''long continued neglect,'' and that the dangerous condition must have existed for ''an unreasonable length of time'' or ''a considerable length of time.'' Appellant argues that, under the rules of these cases, the 4 or 5-day period which elapsed from the time respondent's witnesses first noticed the crack until the cave-in occurred was not a sufficient length of time to hold that the city had constructive notice of the dangerous and defective condition. In this regard it relies strongly on the case of *Dineen* v. *San Francisco,* 38 Cal.App.2d 486 [101 P.2d 736], wherein this court said: ''Appellant next contends that constructive notice is sufficient under some circumstances to impose liability under the Public Liability Act. This is undoubtedly the law. (*Dawson* v. *Tulare Union High School,* 98 Cal.App.138 [276 P. 424]; *Hook* v. *City of Sacramento,* 118 Cal.App. 547 [5 P.2d 643]; *Rafferty* v. *City of Marysville,* 207 Cal. 657 [280 P. 118].) Under these cases long-continued existence of a patent defective condition may establish constructive notice thereof. These cases go no further, however, than to hold that if the evidence shows that the dangerous condition is long continued and patent the governmental agency cannot successfully contend that it was not aware of it. In the present case it is contended that the defect is one which would have been discovered had the respondent exercised reasonable care in inspecting the seats. The cases do not support such an extension of the rule. . . . There is no direct or indirect evidence from which the jury could have inferred that the con-

dition had existed for a long enough period that defendant would have had an opportunity to repair it, or that a reasonable inspection would have disclosed it.''

Appellant also quotes from *Nicholson* v. *City of Los Angeles,* 5 Cal.2d 361 [54 P.2d 725], in which it is said at pages 363, 365: ''This statute constitutes a modification of the rule of nonliability of municipalities for acts performed in a governmental capacity, and recovery thereunder is only possible where all the requirements conditioning the city's liability are supplied. It is not enough to show a dangerous condition of the property. 'The municipality must have had notice and have failed to exercise its opportunity to remedy the condition. The theory of the act seems to be that liability is imposed not alone for the dangerous condition, but for the failure to remedy it, upon knowledge or notice thereof. The elements of knowledge or notice are logically essential to show culpability in failure to remedy the condition, and proof of one or the other is necessary to recovery.' (*Watson* v. *City of Alameda,* 219 Cal. 331 [26 P.2d 286].) See, also, *Crone* v. *City of El Cajon,* 133 Cal.App. 624 [24 P.2d 846], and *Pittam* v. *City of Riverside,* 128 Cal.App. 57 [16 P.2d 768]. . . .

''Constructive notice ordinarily involves, as an essential element, actual notice of facts or circumstances which are sufficient to put a prudent person on inquiry as to the existence of the fact with respect to which he is charged with constructive notice. It is so provided in our code definition. (Civ. Code, sec. 19.) In *Wilkerson* v. *Thorp,* 128 Cal. 221 [60 P. 679], which is illustrative of this principle, it was held that knowledge of the existence of a lease did not charge with constructive notice of unusual provisions contained therein, although it constituted constructive notice of provisions customarily contained in leases. It is there said: 'Constructive notice is a knowledge of such facts, that the party possessing such knowledge is conclusively presumed to know other things besides the facts which have been proven to have come to his knowledge. The information or knowledge of facts possessed by a party must be such that he is conclusively presumed to have notice of the main fact to which the constructive notice is invoked.' Consequently there must be shown, in order to charge the city with constructive notice under these principles, some element of conspicuousness or notoriety so as to put the city authorities upon inquiry as to the existence of the defect or condition and its dangerous character. It is equally clear,

we think, that where the city is charged with constructive notice on the basis of a duty to inspect, it must be made to appear that a reasonable inspection would have disclosed the defect or dangerous condition; that is, that had there been no neglect of duty there would have been actual knowledge on the part of the city officers.''

Plaintiff argues that defendant has misconceived the definition of ''constructive notice'' and quotes the following language of our Supreme Court in the recent case of *Fackrell* v. *City of San Diego*, 26 Cal.2d 196, at page 206 [157 P.2d 625, 158 A.L.R. 625] : ''Actual notice of a defective or dangerous condition is not required. Constructive notice satisfies the statute. (*Laurenzi* v. *Vranizan* (1945), 25 Cal.2d 806, 812 [155 P.2d 633] ; *Dawson* v. *Tulare Union High School* (1929), 98 Cal.App. 138, 142 [276 P. 424] ; *Hook* v. *City of Sacramento* (1931), 118 Cal.App. 547, 553 [5 P.2d 643] ; *Bennett* v. *Kings County* (1932), 124 Cal.App. 147, 153 [12 P.2d 47].) Constructive notice is defined by section 19 of the Civil Code as that knowledge of circumstances 'sufficient to put a prudent man upon inquiry as to a particular fact' where 'by prosecuting such inquiry, he might have learned such fact.' The rules governing constructive notice require reasonable diligence in making inspections for the discovery of unsafe or defective conditions. (*Laurenzi* v. *Vranizan* (1945), *supra*, pp. 811-812; *Nicholson* v. *City of Los Angeles* (1936), 5 Cal.2d 361, 364-365 [54 P.2d 725].)''

Plaintiff also cites *Wise* v. *City of Los Angeles*, 9 Cal.App. 2d 364 [49 P.2d 1122, 50 P.2d 1079], where the court said at page 366 : ''Defendant relies for reversal of the judgment on three propositions. . . . Third. The existence of a defective condition in a public street for the period of four or five days does not as a matter of law constitute constructive notice to the municipality and a reasonable time to remedy the condition under the Public Liability Act of 1923, Statutes of 1923, page 675, Act 5619, Deering's General Laws, volume II, page 3052. . . . Turning to defendant's final proposition, it is a question of fact for the trial court to determine whether the dangerous condition in the public street had existed for a sufficient length of time to constitute constructive notice and also whether a reasonable time to remedy the condition had existed.'' (Italics omitted.)

In *Sheldon* v. *City of Los Angeles*, 55 Cal.App.2d 690, it is said at page 693 [131 P.2d 874] : ''A municipality is liable

for damages resulting from a defective condition existing in one of its sidewalks in the absence of actual knowledge or notice of the dangerous condition, where a presumption of constructive notice has been created from the existence of the dangerous condition for an unreasonable length of time. (*Wise* v. *City of Los Angeles,* 9 Cal.App.2d 364, 366 [49 P.2d 1122, 50 P.2d 1079].) . . . In *Wise* v. *City of Los Angeles, supra,* the existence of a defect for four or five days was held to be substantial evidence to sustain a finding that defendant municipality in such case had constructive notice of the defect.''

And in the recent case of *Kirack* v. *City of Eureka,* 69 Cal. App.2d 134, the court said (p. 140) [158 P.2d 270]: ''When reasonable minds may differ regarding the question as to whether defective conditions which have existed for sufficient time, under the particular circumstances of a case, will charge a municipality with constructive knowledge thereof, the conclusions of the jury in that regard may not be interfered with on appeal. (*George* v. *City of Los Angeles,* 51 Cal.App.2d 311, 315 [124 P.2d 872]; *Smith* v. *County of San Mateo,* 62 Cal.App.2d 122, 128 [144 P.2d 33]; *Silva* v. *County of Fresno,* 63 Cal.App.2d 253, 260 [146 P.2d 520]; *Balkwill* v. *City of Stockton,* 50 Cal.App.2d 661, 667 [123 P.2d 596]; *Johnson* v. *County of Fresno,* 67 Cal.App.2d 116 [153 P.2d 557]; *Fackrell* v. *City of San Diego,* 26 Cal.2d 196 [157 P.2d 625, 158 A.L.R. 625]; 43 C.J. § 1804bb, p. 1026; 7 McQuillin's Mun. Corp. (2d ed.) § 3004, p. 246.)''

While it is true, as argued by defendant, that in practically all of the cases cited, a longer time than four or five days elapsed between the first evidence of a defect and the accident, we believe it is likewise true that there is no hard and fast rule as to the amount of time that must elapse before a court or jury will be justified in holding that a defendant had constructive notice of the dangerous and defective condition. What amounts to ''long continued neglect,'' ''a considerable length of time'' or ''an unreasonable length of time'' are matters which must be determined in accordance with all the facts and circumstances of the particular case under consideration. What might be ''long continued neglect'' or ''an unreasonable length of time'' in one case might not be so in another, and we believe that under the authorities the true rule for an appellate tribunal to follow is that when reasonable minds may differ regarding the question as to whether defec-

tive conditions have existed for a sufficient length of time under the particular circumstances of a case to charge a municipality with constructive knowledge thereof, the conclusion of the jury in that regard may not be interfered with on appeal.

Applying the rule to the instant case, we are unable to agree with the contention of defendant that it must be held as a matter of law that the implied findings of the jury that the dangerous and defective condition had existed for a sufficient length of time to constitute constructive notice to the city and that the city had a reasonable time to remedy the condition or protect the public against it, lack substantial support in the record.

Defendant next contends that the trial court erred in admitting evidence that there was a replacement by the defendant city of the sewer pipe in the entire block six months subsequent to the accident, and that such error was highly prejudicial to defendant.

The record shows that Emile Muheim, Superintendent of the Bureau of Street and Sewer Repair of defendant city was called by plaintiff and interrogated under section 2055 of the Code of Civil Procedure. He testified, without objection, to the fact that in July, 1943, a portion of the sewer in the middle of the block had been replaced; that in January, 1944, following the accident here involved, 84 feet of new sewer pipe was installed from the property line of Van Ness Avenue westerly; and that the distance between the ends of where the new pipe was laid was 113 feet. Counsel for plaintiff then asked the following question: "Q. Mr. Muheim, isn't it a fact that in June, 1944, the defendant City and County of San Francisco replaced the sewer from Van Ness to Franklin?" No objection was interposed, and the witness answered, "That is correct." Then counsel for plaintiff asked: "Q. And in the replacing of that entire sewer from Franklin to Van Ness, it replaced the type of sewer pipe that was in there from the old cement pipe to vitrified clay pipe?" Counsel for defendant then asked that the previous answer be stricken and objected to the question on the ground that anything subsequent to the accident "with reference to correction, et ectera, is not proper evidence." The jury was then excluded and the matter argued by counsel and the court indicated that he would overrule the objection. The question was read to the witness and the objection of counsel for defendant was over-

ruled, but there was no ruling, nor any request for a ruling, on the motion to strike out the answer to the previous question. Counsel for defendant in objecting to any further question along the same line stated: ". . . I will qualify it in this way, that to anything that might be done within a short period of time after January 7, 1944, my objection as I understand the law would not be well taken. But so far as a period of three or four months or six months, I object to that type of testimony."

Defendant relies chiefly upon the case of *Laurenzi* v. *Vranizan*, 25 Cal.2d 806 [155 P.2d 633]. In that case the defendant city's motion for a nonsuit was granted in an action for injuries sustained by a pedestrian on a sidewalk. The Supreme Court reversed the judgment entered on the order granting the motions for nonsuit as to counts 1 and 2 upon the ground that the evidence was sufficient to submit the issue as to the city's liability to the jury, and in its opinion stated that the ruling of the trial court excluding evidence of subsequent repairs was proper and added the following language quoted by defendant: ". . . The evidence of subsequent repairs would tend only to prove knowledge after the accident and not the prior knowledge which the Public Liability Act requires (*Helling* v. *Schindler*, 145 Cal. 303, 312 [78 P. 710]; *Meyer* v. *San Francisco*, 9 Cal.App.2d 361, 364 [49 P.2d 893]; *Gorman* v. *County of Sacramento*, 92 Cal.App. 656, 665 [268 P. 1083])."

Under the authorities cited it would seem to be the law in California that evidence of subsequent repairs or changes is not admissible to prove prior negligence. However, we do not believe that, upon the record here, there was any prejudice resulting to defendant in permitting the superintendent of sewers to testify that the city had replaced the concrete pipe in the remainder of the block with vitrified clay pipe after he had already testified that he had replaced a portion of the sewer in the middle of the block in July, 1943, and 84 feet from the westerly line of Van Ness Avenue in January, 1944, following the accident. Furthermore, as already pointed out, the witness had already given an answer stating that the defendant city had replaced the sewer in the entire block in June, 1944, before the question was asked to which objection was made. As we will point out hereafter, the jury was correctly instructed that as to the issue of the liability of defendant under the Public Liability Act, and

bearing in mind that, under section 4½ of article VI of our state Constitution, ''No judgment shall be set aside, or new trial granted, in any case, on the ground of . . . improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice,'' we do not believe that the overruling of defendant's objection to said evidence, even if error, justifies a reversal of the judgment.

Defendant also contends the trial court committed serious and prejudicial error in giving certain general instructions upon the question of negligence. Defendant quotes the following language from *Watson* v. *City of Alameda*, 219 Cal. 331, 333 [26 P.2d 286]: ''The municipality is not, under this statute, liable in the same manner as a private corporation, for negligence of its employees; nor is it enough to show a dangerous condition of property. The municipality must have had notice and have failed to exercise its opportunity to remedy the condition.''

While it is true that a municipality is not liable for the mere negligence of its employees, yet it is also true, as stated by defendant in its closing brief ''that where a city maintains a property in defective condition, knowing it to be in such defective condition, it is guilty of one form of negligence.'' Before giving the general instructions as to negligence, none of which stated that plaintiff was entitled to recover from defendant upon proof that defendant or its employees were negligent, the court instructed the jury as follows: ''Now I am going to give you a couple of instructions, ladies and gentlemen, on the subject of negligence, but negligence as involved in this case is attached very definitely to instructions that I will give you afterwards. Of course you have already been instructed to consider all the instructions, that is, collectively and interchangeably,—not interchangeably so much as to the extent that one has any reference to the other, and that applies particularly to the instructions I am now about to give you on the subject of negligence.''

Thereafter the court correctly instructed the jury as to the liability of a municipality under the Public Liability Act. The instructions given by a trial court must be considered as a whole and we are convinced that in the instant case, taking the instructions as a whole, the jury must have understood that the instructions defining negligence were related to and

qualified by the subsequent instructions relating to the Public Liability Act.

Defendant contends further that the following instructions given by the trial court and relating to the Public Liability Act are erroneous: "You are further instructed that there is no hard and fast rule that can be laid down in cases of this kind as to the character or extent of the defect in the street in order to hold a city liable but each case must stand upon its own particular facts and it is a question of fact for you to determine whether a defect in the street is of such a nature as to render the city liable in accordance with the instructions which the Court gives to you." "You are further instructed that a municipality is liable for damages proximately resulting from a defective condition in one of its streets, in the absence of actual knowledge or notice of the defective condition where a presumption of constructive notice has been created from the condition of a defective condition for an unreasonable length of time. You are, therefore, instructed that it is your duty to determine from the testimony in this case whether or not a defective condition existed in Bush Street, and if you find one existed, whether such defective condition existed for a sufficient length of time to constitute constructive notice, and also whether a reasonable time to remedy such condition had elapsed prior to January 7, 1944. That was the date of the accident." "You are further instructed that a municipality is presumed to have notice of the existence of defects which are conspicuous." "In order to apply the doctrine of constructive knowledge you must believe that the defect was so apparent that the proper city officials should have observed said alleged defect."

Defendant cites no authorities to support its argument upon this point, and we believe that under the authorities hereinbefore set forth, the instructions complained of correctly state the law.

Defendant's final contention is that the damages awarded plaintiff are grossly excessive. The general rule upon the point is well stated in *Bellman* v. *San Francisco H. S. Dist.*, 11 Cal.2d 576 [81 P.2d 894], as follows: "Before an appellate court may interpose its judgment as to the sum which will compensate a plaintiff for personal injuries, it must appear that the recovery is so excessive, when compared with a sum reasonably warranted by the evidence showing the nature and extent of the injuries received, as to shock the sense of justice

and raise the presumption that the amount was arrived at as the result of passion and prejudice rather than upon a fair and honest consideration of the facts.''

The verdict of the jury was in the sum of $3,585, $500 of which was for damages to plaintiff's automobile. Plaintiff's medical bill was approximately $130 and he lost $200 in salary during the time he was unable to work. This would leave as general damages the sum of $2,755.

Plaintiff testified that in March, 1945, some 14 months after the accident, he still felt pain in his elbow which was injured by hitting against the door of his automobile at the time of the accident. He also testified that his side was ''banged'' against the door very hard, and while it did not break his ribs, he suffered strong muscular aches and pains. He testified also, among other things, that prior to the accident he had always been healthy, but that ever since the accident he had been ''jittery'' and ''can't sleep at night.'' The statement of plaintiff's doctor confirms his testimony.

Taking all of the evidence on the question of damages into consideration, we cannot say that the amount of the verdict in this case was so large as to shock the sense of justice and raise the presumption that the amount awarded was the result of passion or prejudice.

In view of the foregoing the judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 24, 1946.